**SIGNED THIS: January 20, 2010**

_____
**WILLIAM V. ALTENBERGER
UNITED STATES BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PATRIOT SEEDS, INC., | ) | No. 03-84217 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| RICHARD E. BARBER, not personally, but as Chapter 7 Trustee for Patriot Seeds, Inc., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 04-8205 |
| | ) | |
| TREIMER INDUSTRIES, | ) | |
| Defendant. | ) | |

**O P I N I O N**

This adversary proceeding is before the Court for decision after a trial on the Complaint filed by the Chapter 7 Trustee, Richard Barber ("Trustee"), against the Defendant Treimer Industries ("Defendant"), pursuant to Section 547 of the Bankruptcy Code, to recover an allegedly preferential payment of $75,657.65 made by the Debtor, Patriot Seeds, Incorporated ("Debtor") to the Defendant.

The basic facts giving rise to this adversary proceeding are not disputed.  Prior to filing for bankruptcy, the Debtor was in the business of producing seed corn and seed beans for sale to farmers for planting.  With respect to the seed beans, the Debtor had a contract to produce "Round Up Ready" soybean seed with Monsanto Chemical Company, the holder of the patent.  The Debtor in turn entered into seven contracts with the above-named Defendant to grow the seed beans during the 2002 crop year for sale to the Debtor, who in turn would sell the seed beans to other farmers for production of soybean crops.[1]  The Defendant had been growing seed beans for the Debtor for several years before the crop year at issue in this adversary proceeding.

Prior to the 2002 crop year, the procedure the Debtor and the Defendant utilized was as follows.  In the fall of the year preceding the applicable crop year or early into the crop year, the Defendant would purchase from the Debtor the seed from which to grow the seed beans.  In the spring of the crop year, the Debtor and the Defendant would enter into contracts for the growing of the seed beans for that crop year.[2]  In the fall of the crop year, as the seed beans were harvested, the Defendant would have them weighed and delivered to the Debtor's facility, where they were stored in segregated bins.  The Debtor would also send the Defendant a letter indicating the results of quality tests administered to determine if the seed beans met the prescribed standards.  If the tests confirmed the seed beans met the prescribed standards, they could be priced by the Defendant and

---

[1] According to the documentation introduced into evidence, it appears that, for crop year 2002, the Defendant produced seed beans under five of the seven contracts: Contract No. 02-242 for variety 24X14, Contract No. 02-245 for variety 25R15, Contract No. 02-247 for variety 267RR, Contract No. 02-247 SPEC for variety 267RR, and Contract No. 02-289 for variety 31X12.  The record contains two contracts, Nos. 02-262 and 02-262 SPEC to produce variety 29X11, but the Seed Grower Settlement Statement for contract year 2002 does not show any seed beans of this variety were produced.

[2] All of the contacts were either speculative or non-speculative.  The main difference between the speculative and the non-speculative agreements is that under the non-speculative (or regular) contract, if the seed beans were unused, the grower would still be entitled to a 25¢ per bushel payment, known as the "unused bushel premium."  Under the speculative contract, the grower was not entitled to any premium for unused seed beans.  Also, under the regular contract the grower could price the seed beans before delivery to the Debtor, while under the speculative contract, the grower could only establish the price after delivery of the seed beans to the Debtor.  In most instances, these differences are not pertinent to the issues before this Court, and this Court will refer to the contracts generally.  Where the distinctions between the two types of contracts are relevant, such distinction will be noted.

purchased by the Debtor. If they did not meet the prescribed standards, the seed beans could be rejected by the Debtor.

Under both the non-speculative and the speculative contracts, if the Defendant priced its seed beans on or before the first of May, the Debtor was required to make payment within seven days after the first Monday in May. If the seed beans were priced after May first, then payment would be made within ten business days after establishing the price. Once the seed beans were priced, the Debtor would send the Defendant a Seed Grower Pricing Confirmation letter, indicating that the Debtor had accepted the Defendant's offer to sell. In conjunction with payment to the Defendant, the Debtor would send the Defendant a Seed Grower Settlement Statement showing by contract number the amount of bushels delivered, the number of bags produced, the number of bushels that were unused as seed beans, any applicable premiums awarded, and the total to be paid under each contract. The Debtor would finance the payments to the Defendant by a line of credit from the Lincoln State Bank.

The procedure for the 2002 crop year, which is the crop year giving rise to this litigation, was slightly different. The difference arose because the Debtor switched its financing from the Lincoln State Bank to the John Deere Farm Plan Credit Program ("Farm Plan"). On May 16, 2003, the Debtor sent the Defendant a letter advising it of the change in financing and stating that as a result of this change the date of payment would be extended to an estimated date of June 10, 2003. The letter also stated that the Debtor would pay an additional 1% in interest "to compensate for the delay in payment." (Trustee's Exhibit #4) The Debtor issued a check in the amount of $75,657.65 to the Defendant on June 16, 2003.

On September 4, 2003, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On March 16, 2004, the case was converted to one under Chapter 7, and Richard Barber was appointed as the Chapter 7 Trustee for the case. The Trustee commenced the

instant adversary proceeding against the Defendant under § 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), alleging the delayed payment for the 2002 crop year was a preference. In response, the Defendant denied the existence of a preference and raised the affirmative defense under § 547(c) that the delayed payment was in the ordinary course of business and therefore was not avoidable as a preferential transfer. The Defendant was one of many farmers to be sued by the Trustee to recover alleged preferences. The other farmers either settled with the Trustee or had their cases tried in a separate proceeding. For a somewhat more detailed discussion of the facts and the issues raised under § 547(b) and (c), see this Court's opinion in *Barber v. Murphy,* Adversary Number 03-8290, also entered this day.

The issues before this Court involve both § 547(b) and (c). This Court will first address the issues under § 547(b), which provides that, subject to certain exceptions, a trustee may avoid any transfer of an interest of a debtor in property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made –
>    (A) on or within 90 days before the date of the filing of the petition; or
>    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if –
>    (A) the case were a case under chapter 7 of this title;
>    (B) the transfer had not been made; and
>    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The Trustee has the burden of proof on these elements. 11 U.S.C. § 547(g); *In re Jones*, 226 F.3d 917, 921 (7th Cir. 2000). Of these elements, only two are genuinely contested by the Defendant: (1) did the Trustee prove there was an antecedent debt and (2) did the Trustee prove the Defendant received more than it would have received in a Chapter 7 case?

The only evidence presented at trial by the Trustee was the testimony of the Trustee and the Debtor's records pertaining to its dealings with this Defendant, both for the year at issue and for previous years. The Defendant presented no evidence and relied on arguments based on the Trustee's evidence.

The term "antecedent debt" is not defined by the Code. However, the term "debt" is defined as a "liability on a claim." 11 U.S.C. § 101(12). The Code defines "claim" as "any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. 101(5). A debt is "antecedent" for purposes of § 547(b) if it was incurred before the debtor made the allegedly preferential transfer. *In re Bridge Information Systems, Inc.*, 474 F.3d 1063, 1066 (8th Cir. 2007). In addition, a debt is deemed to have been incurred on the date upon which the debtor first becomes legally bound to pay. *Id.* In the context of a contract, courts have found that a debt arises after the creditor has tendered performance pursuant to the terms of the contract. *In re Gold Coast Seed* Co., 751 F.2d 1118, 1119 (9th Cir. 1985) (citing *Matter of Emerald Oil Co.*, 695 F.2d 833, 837 (5th Cir. 1983)). The Seventh Circuit Court of Appeals has acknowledged that an antecedent debt exists when a creditor has a claim against a debtor, even if the claim is unliquidated, unfixed, or contingent. *Warsco v. Preferred Technical Group*, 258 F.3d 557, 569 (7th Cir. 2001) (citing *In re Energy Co-op. Inc.*), 832 F.2d 997, 1001 (7th Cir. 1987)).

This Court concludes that the payment made by the Debtor to the Defendant was made on behalf of an antecedent debt because the documentary evidence clearly shows that the Defendant had completed its performance under the contracts before the Debtor made payment on June 16, 2003. The contracts were entered into by the parties on April 4, 2002, except for Contract No. 02-247, which is not dated by the Defendant and was signed by the Debtor's contracting manager, Marge Cheeseman, on May 17, 2002. The seed beans were grown during the spring and summer of the

5

2002 crop year. The seed beans were harvested in the fall of 2002 and delivered to the Debtor in November of 2002 and February of 2003. The Defendant priced its contracted seed beans on December 10, 2002, and the Debtor accepted the offer to sell on that same day. The Defendant also priced some additional bushels on May 9, 2003.[3] Once the Defendant grew, harvested, delivered and priced the beans, the Defendant's performance under the contract was complete and nothing remained for the Defendant to do. At this point, the Debtor became legally obligated to pay the Defendant and the debt arose. *See Gold Coast Seed*, 751 F.2d at 1119. Therefore, because it is clear from the record that the Debtor first became obligated to pay the Defendant before the date on which the payment was made, this Court finds that the payment at issue was made on or account of an antecedent debt.[4]

The Defendant also contends that the Trustee failed to prove the Defendant received more by the payment than it would have received in a Chapter 7 liquidation case. The Trustee testified that, as of the date of trial, claims totaling $18,700,181.06 had been filed and that he was holding approximately $962,968.32 in cash. The Trustee also testified that there were ten other preference cases pending, which he valued at $753,000 collectively. After subtracting $250,000 in attorneys' fees, the Trustee testified that in the best case scenario represented by a full recovery in each of the pending preference actions, the bankruptcy estate would total around $1,462,968.32. The Trustee further testified that no general unsecured creditor would receive a 100% distribution.

In response, the Defendant, on cross examination of the Trustee, brought out the fact that the Trustee had not objected to claims, and argued that the Trustee really did not prove how much unsecured creditors would receive from the Trustee. The inference from the Defendant's argument

---

[3] There is no Seed Grower Pricing Confirmation letter in the record for the bushels priced on May 9, 2003, but the Seed Grower Settlement Statement shows that on May 9, 2003, for Contract No. 02-242, the Defendant priced an additional 738 bushes and for Contract No. 02-289, the Defendant priced an additional 270 bushels.

[4] It is noted that, given the fact that the Debtor made payment later than the date provided for under the contracts, the gap between when the debt arose and when the payment was made is even greater.

6

is that enough of the claims could be disallowed to allow unsecured creditors to receive 100% distribution.

This Court concludes that, under the circumstances of this case, the Trustee's testimony was sufficient to carry his initial burden of proof to show that the unsecured creditors would not receive a 100% distribution from the Trustee. If the Defendant felt that there were objectionable claims, it should have presented some evidence to that effect. Without such evidence, it is pure speculation that by objecting to claims the total allowable claims would be reduced to the point of allowing for a 100% distribution to general unsecured creditors. For these reasons, this Court concludes that the Defendant received more than it would in a Chapter 7 bankruptcy case. This Court also concludes that a preference under § 547(a) exists and will next address the Defendant's argument that the payment was made in the ordinary course of business.

At the time of the transfer in question, § 547(c)(2) provided as follows:

The trustee may not avoid under this section a transfer–

* * *

>     (2) to the extent that such transfer was–
>
>         (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>         (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>         (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).[5] Stated more simply, to succeed on the ordinary course of business defense, a defendant must prove:

---

[5] This section was modified as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), and the amendments to this section became effective for cases filed on or after October 17, 2005. Prior to the 2005 amendments, to establish the ordinary course of business defense, a creditor had to show *both* that the transfer was made in the ordinary course and was made according to ordinary terms. After the 2005 amendments, a creditor need only show *either* that the transfer was made in the ordinary course *or* that the terms were ordinary. Because the Debtor filed bankruptcy on September 4, 2003, before the effective date the BAPCPA amendments, this Court will apply the prior statute and the case law interpreting it, unless otherwise noted.

7

(1) that the debt was incurred by the debtor in the ordinary course of business;

(2) that payment was made by the debtor in the ordinary course of business; and

(3) the payment was made according to ordinary business terms.

A creditor asserting the ordinary course of business defense has the burden to prove each element by a preponderance of the evidence. 11 U.S.C. § 547(g); *Matter of Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir. 1995). If the creditor fails to prove any of the three elements, the defense is inapplicable. *In re H.L. Hansen Lumber Co. of Galesburg, Inc.*, 270 B.R. 273, 277 (Bankr.C.D.Ill. 2001).

The purpose of the ordinary course of business defense is to "leave undisturbed normal commercial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of both the debtor and the debtor's transferee." *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003). Further, the ordinary course of business defense furthers the policy of preventing dismemberment of the debtor during its slide into bankruptcy by enabling the debtor to make unavoidable payments that enables the struggling debtor to continue operating its business. *Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S.Ct. 527, 532-33, 116 L.Ed.2d 514 (1991).

Although the Defendant had the burden of proof on this issue, it presented no evidence at trial to support its argument that the payments were made in the ordinary course of business. Rather, the Defendant relied on the documentary evidence presented by the Trustee to establish that the payment was made by the Debtor in the ordinary course of business.

Turning to the first element of the ordinary course of business defense, the Defendant must initially show that the debt was incurred in the ordinary course of business or financial affairs of the debtor and the transferee. *See* 11 U.S.C. § 547(c)(2)(A). The Trustee has stipulated in his brief that the debt was incurred in the ordinary course of business of the Debtor and the Defendant, and the Court so finds.

The second element requires that the payments were made "in the ordinary course of business or financial affairs of the debtor and the transferee." *See* 11 U.S.C. § 547(c)(2)(B). Courts have interpreted this requirement to be "subjective" in nature insofar as it requires courts to consider whether the transfer was ordinary in relation to the other business dealings between the debtor and that particular creditor. *In re Globe Manufacturing Corp.*, 567 F.3d 1291, 1298 (11th Cir. 2009).

To determine whether the payments were made and received in the ordinary course of the parties' business dealings, the court must make a factual inquiry into the prior dealings of the parties. *In re Schick*, 234 B.R. 337, 348 (Bankr.S.D.N.Y. 1999). The goal of the inquiry under § 547(c)(2)(B) is to establish a "baseline" of dealings between the parties fixed at least in part during a time in which the debtor's day-to-day operations were "ordinary" in the layman's sense of the word. *In re Hancock-Nelson Mercantile Co., Inc.*, 122 B.R. 1006, 1013 (Bankr.D.Minn. 1991); *see also Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993) ("The most important thing is . . .that [the dealings between the debtor and the allegedly favored creditor] conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period."). The Seventh Circuit Court of Appeals has provided the following non-exhaustive list of factors to consider in evaluating whether a transaction satisfies § 574(c)(2)(B):

(1) the length of time the parties were engaged in the transaction at issue;

(2) whether the amount or form of tender differed from past practices;

(3) whether the debtor or the creditor engaged in any unusual collection or payment activity; and

(4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Kleven*, 334 F.3d at 642 (citing *Barber v. Golden Seed Co. Inc.*, 129 F.3d 382, 390 (7th Cir. 1997)). Additionally, some courts also consider the timing of the payments as a factor to evaluate. *See Hansen Lumber*, 270 B.R. at 277. Untimely payments are more likely to be considered outside the

9

ordinary course of business and therefore avoidable as preferences. *Globe Manufacturing*, 567 F.3d at 1298 (quoting *In re Craig Oil*, 785 F.2d 1563, 1567-68 (11th Cir. 1986)). However, a creditor may present evidence to rebut the presumption that late payments were out of the ordinary. *Id*. Thus, although as a general rule the relationship between the parties may be determined by looking at their specific contractual agreement, it is possible for the parties to deviate from or modify their written contract and still act within the ordinary course of their business dealings as long has the parties had previously acted outside of their contract. *See Matter of Xonics Imaging Inc.*, 837 F.2d 763, 766-67 (7th Cir. 1988); *Tolona Pizza*, 3 F.3d at 1032 ("[A] 'late' payment really isn't late if the parties have established a practice that deviates from the strict terms of their written contract.").

In this case, under the terms of the contracts, payment to the Defendant for the contracted bushels priced before the first Monday in May was due by May 12, 2003, and payment for the additional bushels priced on May 9, 2003, was due to the Defendant by May 23, 2003. The Debtor paid the Defendant for all the delivered bushels by a check dated June 16, 2003. The parties do not dispute that the June 16, 2003, payment by the Debtor was late under the terms of the contracts.

The Defendant argues that the Trustee's own evidence establishes that the payment, despite being late, was made in the ordinary course of business between the parties because the evidence shows that the Debtor had been late in paying the Defendant on two occasions prior to the 2002 crop year. Specifically, the Defendant notes that it was paid eleven days late in 2000 for crop year 1999 and it was paid four days late in 2001 for crop year 2000. The Defendant concludes that, because the parties established a practice that deviated from the strict terms of their contract, the payment for the 2002 crop year, which was thirty-five days late, was consistent with the previous dealings of the parties and therefore was within their ordinary course of business.

The Trustee concedes that the record shows the Defendant was paid late in 1999. However, the Trustee points out that the payment for crop year 2000 was actually made on time because the

10

Defendant priced its seed beans after the first Monday in May, and the applicable contract provided for payment within ten business days after the price was established if the Defendant priced its seed beans after the first Monday in May. The Trustee asserts that this leaves only one late payment in the history between the parties, and one late payment does not establish a pattern or history of late payments. The Trustee concludes that the evidence shows that the ordinary course of dealings between the parties was for the Debtor to pay the Defendant as provided by the contract for the applicable crop year.

A review of the Seed Grower Settlement Statement for crop year 2000 shows that the Trustee is correct: for that year, the Defendant produced two varieties of seed beans for the Debtor under two contracts. The Defendant priced the seed beans under both contracts on May 11, 2001. Section 1, paragraph 4, which is identical in both contracts, provides, "Payment to the Producer will be written within seven days after the first Monday in May, 2001. Pricing established after this date will be paid within ten business days after establishing price." The first Monday in May 2001 was May 7. The settlement statement shows that the Defendant priced its seed beans under both contracts on May 11, 2001, and received payment on May 18, 2001. Because the Defendant priced its seed beans after the first Monday in May, under the terms of the contract, the Debtor had ten business days to make payment. Therefore, the payment made on May 18, 2001, which was five business days later, was timely under the terms of the contracts.

Accordingly, the evidence shows that from 1996 to 2001, the Debtor only paid the Defendant late on one occasion in 1999. Payments for all of the other years were made according to the terms of the contracts. A single untimely payment does not establish a pattern, history or course of dealing in which late payments are the ordinary course of business between the parties. To the contrary, because the record shows that the Debtor normally made timely payments under the contracts, the

11

late payment made in 2003 was the exception rather than the rule, and this Court therefore concludes it was not made within the ordinary course of dealing between the parties.

The Defendant also argues that the May 16, 2003, letter amounts to new terms to which it agreed, thus making the payment timely. The Defendant asserts that the record demonstrates its assent to the new terms because there is no evidence showing the Defendant complained of the delay in payment or instituted any sort of collection activity. Because the Defendant agreed to be paid as provided in the May 16, 2003, letter, the contract was modified or a novation was created, and therefore the payment was timely.

The Trustee counters that the May 16, 2003, letter is actually evidence demonstrating that the June 16, 2003, payment fell outside the ordinary course of business because it is the only letter of its kind sent during the six years the parties did business together. The Trustee also asserts there is no evidence that the Defendant affirmatively accepted the unilateral statement of the Debtor, which would have resulted in an amendment to the contracts.

A novation is the substitution of a new obligation for an existing one, whereby the existing obligation is extinguished. *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 887 (7th Cir. 2005) (citing *Faith v. Martoccio*, 21 Ill.App.3d 999, 316 N.E.2d 164, 167 (Ill.App. 2 Dist. 1974)). The four elements of a novation, which must be proved by a preponderance of the evidence by the party asserting the defense, are: (1) a previous, valid obligation; (2) a subsequent agreement of all the parties to the new contract; (3) extinguishment of the old contract; and (4) the validity of the new contract. *Id*. (citing *Phillips and Arnold, Inc. v. Frederick J. Borgsmiller, Inc.*, 123 Ill.App.3d 95, 462 N.E.2d 924, 928, 78 Ill.Dec. 805 (Ill.App. 5 Dist. 1984)). For there to be a novation, the obligee must assent to the substitution and agree to release the obligor, but such assent need not be express but may be implied from the circumstances of the transaction or the obligee's subsequent behavior.

*Id*. (citing *Burnett v. West Madison State Bank*, 375 Ill. 402, 31 N.E.2d 776, 780 (1941)). In *In re Hatfield*, 117 B.R. 387, 390 (Bankr.C.D.Ill. 1990), in the context of determining whether a refinancing agreement was a renewal of the old contract or a novation, this Court set forth the applicable test for determining whether a novation exists:

> [T]he test for delineating between a novation and a renewal is the "degree to which the original obligation of the debtor has changed and, to some extent, on any additional consideration which was conveyed by the debtor to the creditor. [Citation omitted] The greater degree of change in obligation or increase in obligation, the more likely a novation will be found.

A review of May 16, 2003, letter shows that it was a unilateral statement by the Debtor that payment for the 2002 crop year would be delayed. The purpose of the letter was to explain, in a factual manner, the reasons why the payment contractually due on May 12, 2003, was delayed and to offer an additional 1% interest on the payment as compensation for the delay. The letter does not purport to create new contracts to substitute for the originals or to extinguish the old contracts. Nor does the letter solicit an assent from the Defendant to the change in payment terms. Nothing in the letter requires any agreement or assent, either express or implied, on the part of the Defendant. Additionally, the only term of the original contracts affected by the letter is the payment term; all of the other obligations of the Debtor and the Defendant agreed to in the original contracts remain unchanged. The thirty-five day late payment and the 1% interest offered on the late payment, which constitutes minimal additional consideration, are, given all the circumstances, minor changes in nature. This Court, therefore, concludes that the letter does not rise to the level of constituting a novation.

Likewise, this Court also concludes that the letter does not create an amendment to the payment terms set forth in the original contracts. Again, there is nothing in the record showing that there was ever an agreement between the parties concerning the new payment term. Rather, the

evidence shows the late payment was unilaterally imposed on the Defendant by the Debtor. Even if the Defendant's consent to the change in payment terms can be implied from its failure to protest the late payment, the evidence shows that there is no history of the parties amending the contracts and that the ordinary course of business between the parties was for the Debtor to pay according to the original contract terms, except for the one late payment for crop year 1999 previously noted.

Even if this Court had concluded that the Defendant met its burden of proving the second element of the ordinary course of business defense under § 547(c)(2)(B) that payment was made within the ordinary course of business between the Debtor and the Defendant, this Court still concludes that the Defendant failed to meet its burden to show that the transaction was objectively ordinary under the third element contained in § 547(c)(2)(C). Section 547(c)(2)(C) requires that the payment be made "according to ordinary business terms." In discussing § 547(c)(2)(C), Collier on Bankruptcy provides a general overview of what this subparagraph requires as follows:

> *[I] The Industry Standard*
>
> Subparagraph (C) establishes a requirement that a creditor prove that the debtor made the challenged transfer in harmony with the range of terms prevailing in some relevant industry's norms. The provision allows the creditor considerable latitude in defining what the relevant industry is; even departures from the relevant industry norms that are not so flagrant as to be "unusual" remain within subparagraph (C)'s protection.
>
> "Ordinary business terms" refers to the range of terms that encompass the practices in which firms similar in some general way to the creditor in question engage, and only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subparagraph (C). This does not imply that the creditor must prove the existence of some single uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry.
>
> *[II]–Defining the Industry.*
>
> In order to determine whether the defendant has satisfied its burden of showing that the payments were withing industry standards, the court must first define the relevant industry. This is only a portion of the solution, however, since the court must determine how broadly or how narrowly to define the creditor's industry.

\* \* \*
*[IV]–Proof That Transfer Was Consistent with Industry Standards.*

Once the court has defined the relevant industry, chosen the industry standard and decided how much weight to give that standard, the court must weigh the evidence to determine whether the defendant has met the standard.

5 COLLIER ON BANKRUPTCY ¶547.04[2][a] (Alan N. Resnick & Henry J. Sommer, eds., 15 ed. rev.). Thus, the creditor must: (1) define the relevant industry; (2) establish the practices of that industry; and (3) establish that the relations between the debtor and the creditor fall within the normal practices of that industry. *See In re NETtel Corp., Inc.*, 364 B.R. 433, 453 (Bankr.D.Dist.Col. 2006). The Defendant has the burden of proof on all three of these components.

The Defendant asserts that it only needed to establish that its own dealings with the Debtor were situated within the outer limits of normal industry practice. Citing *Midway Airlines*, 69 F.3d at 797, the Defendant notes that § 547(c)(2)(C) does not require the introduction of evidence from competitors or expert witnesses to make this showing. The Defendant then notes that it had done business with the Debtor for "many, many years" and describes the previous payment history of the parties.

The Trustee responds that the Defendant presented no evidence showing the type of industry to be analyzed or the payments standards followed within that industry. The Trustee argues that the Defendant is attempting to rely solely on its own dealings with the Debtor to establish common practices within the industry, and that this type of evidence will not satisfy the requirements of § 574 (c)(2)(C).

The Defendant is correct that it is not required to present evidence procured directly from competitors or to produce expert witnesses to testify concerning industry standards, and it may establish the industry practices in other ways. *Midway Airlines*, 69 F.3d at 797. However, §547(c)(2)(C) requires objective proof that the disputed payment was ordinary in relationship to the

prevailing standards in the industry and proof of the parties' own relationship is insufficient to make this objective showing. *Id*. at 797-98. Because the Defendant did not offer any evidence other than noting its past business relationship with the Debtor, this Court concludes that the Defendant did not meet its burden to show that payment was made according to ordinary business terms as required by § 547(c)(2)(C).

There are two additional issues that must be addressed. First, in reviewing the Complaint filed in this adversary proceeding, this Court notes that the Trustee, pursuant to § 502(d) of the Code, pleaded a second count for disallowance of unsecured claims filed by the Defendant. *See* 11 U.S.C. § 502(d). Section 502(d) provides that the court "shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . or that is a transferee of a transfer avoidable under section . . . 547 . . . unless such entity or transferee has paid the amount, or turned over any such property for, which such entity or transferee is liable under section . . . 550 . . ." In the Complaint, the Trustee asserts that because the Defendant has not paid the amount for which it is liable under § 550, any unsecured claim filed by the Defendant must be disallowed.[6] This issue was not raised at trial.

The Trustee's request for disallowance of the Defendant's claims is premature. The Trustee has brought this avoidance action under §547, and this Court has determined that it is meritorious and that the Trustee is entitled to recovery of the preferential payment from the Defendant. If the Defendant returns the preference payment, it would be entitled, under the language of § 502(d), to file an unsecured claim and to take its pro rata share along with other unsecured creditors. Only if the Defendant does not pay over the preference amount would the Trustee be entitled to disallowance

---

[6]On March 2, 2005, the Defendant filed two unsecured claims, Claim Nos. 292-1 and 293-1, in the amount of $1.00 each, containing the notation, "Contingent claim subject to amendment based on outcome of adversary claim between Chapter 7 Trustee and Claimant, Treimer Industries." Claim No. 293-1 appears to be identical to Claim No. 292-1 except that the box is checked noting that the claim replaces a previous claim filed on March 3, 2005.

16

of the Defendant's claims. Accordingly, this Court will deny any relief under this count at this time without prejudice to the Trustee's filing of a motion requesting such relief at a later time, if necessary.

Finally, the Trustee has requested prejudgment interest from August 24, 2004, the date the complaint was filed, to the date of judgment, at the rate of 4.43%. The Trustee requested the Court to take judicial notice that the average prime rate in August of 2004 was 4.43%.[7]

The Bankruptcy Code does not specifically provide for prejudgment interest. Nevertheless, the Seventh Circuit Court of Appeals has made it clear that in an action under § 547(b), bankruptcy courts have discretion to award prejudgment interest to a successful plaintiff. *Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir. 1998); *Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997). Such discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so. *Milwaukee Cheese Wisconsin*, 112 F.3d at 849. The Seventh Circuit Court of Appeals has also recommended that, where no statutory rate of prejudgment interest exists, the best starting point is to award interest at the market rate, which means an average of the prime rate for the years in question. *Cement Div., National Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998). The "prime rate" is reported by the Federal Reserve Board. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 479, 1245 S.Ct. 1951, 1961, 158 L.Ed.2d 787 (2004). A successful plaintiff is entitled to prejudgment interest from the date of demand for return of the preferential transfer or, if no demand was made, from commencement of the adversary proceeding. *In re Schwinn Bicycle Co.*, 205 B.R. 557, 574 (Bankr.N.D.Ill. 1997).

---

[7]In conjunction with his request for judicial notice, the Trustee tendered a computer printout from the Federal Reserve's website showing the "[a]verage monthly prime rate charged by banks on short-term loans to businesses, quoted on a investment basis." The Defendant affirmatively stated that it had no objection to the introduction of the printout.

17

In this case, there is nothing in the record to indicate any reason not to allow prejudgment interest. The Trustee requests prejudgment interest to be calculated at 4.43%, the rate shown by the Federal Reserve Board for August of 2004, the month in which the Trustee's complaint was filed. As the request for prejudgment interest falls within the Seventh Circuit Court of Appeals's guidelines, it will be allowed.

In conclusion, for the reasons set forth above, this Court finds that the Defendant received a preferential transfer in the amount of $75,657.65. Accordingly, the Trustee is entitled to recover from the Defendant $75,657.65, plus prejudgment interest from August 24, 2004 at the rate of 4.43%.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###